UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| HISTORIC BRIDGE FOUNDATION, | ) | |
| FRIENDS OF THE FRANK J. WOOD | ) | |
| BRIDGE, and NATIONAL TRUST | ) | |
| FOR HISTORIC PRESERVATION | ) | |
| IN THE UNITED STATES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:19-CV-408-LEW |
| | ) | |
| ELAINE CHAO, SECRETARY OF | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF TRANSPORTATION, NICOLE HASEN, | ) | |
| ADMINISTRATOR OF THE FEDERAL | ) | |
| HIGHWAY ADMINISTRATION, TODD | ) | |
| JORGENSEN, ADMINISTRATOR OF THE | ) | |
| FEDERAL HIGHWAY ADMINISTRATION, | ) | |
| MAINE DIVISION, and BRUCE VAN NOTE, | ) | |
| COMMISSIONER OF THE MAINE | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT
ON THE ADMINISTRATIVE RECORD**

The Frank J. Wood Bridge, a through-truss bridge erected in 1932 to span the

Androscoggin River between Brunswick and Topsham, has seen better days. In 2015, the

Maine Department of Transportation ("DOT") began a process to consider alternatives,

two of which involved rehabilitation of the existing bridge and two of which involved its

removal and replacement with a girder bridge. At the conclusion of the administrative

review process, DOT in consultation with the Federal Highway Administration ("FHWA") issued an administrative decision to build a new bridge on a curved alignment adjacent to the existing bridge, relying on the Frank J. Wood Bridge to continue carrying Route 201 traffic during the build cycle, and to decommission and remove the Frank J. Wood Bridge once traffic can be routed over the new bridge.

In this civil action, the Historic Bridge Foundation, Friends of the Frank J. Wood Bridge, and the National Trust for Historic Preservation in the United States (collectively "Plaintiffs") request judicial review under the Administrative Procedures Act. They contend the administrative decision is arbitrary and capricious, an abuse of discretion, or otherwise violative of standards made applicable to the administrative review process under Section 4(f) of the Department of Transportation Act and the National Environmental Policy Act. The matter is before the Court for final disposition on motions for summary judgment on the administrative record.

## BACKGROUND

The municipalities of Brunswick and Topsham are divided by the Androscoggin River. Although there are other river crossings to the east (a bypass route) and west (I-295), the Frank J. Wood Bridge is a particularly important vehicular and pedestrian connection because it carries U.S. Route 201 over the River and ties the heart of these communities together. Structurally, the Bridge is an 805-foot long, three-span, steel through-truss bridge supported by concrete abutments at either end and two interstitial concrete piers. AR 1637, # 37047. The Androscoggin Power Company built the Bridge in 1932 to carry interurban

rail traffic.[1] However, the sun soon set on that mode of transportation due to competition from the growing network of state and federal highways. Consequently, the FJW Bridge left the privately maintained rail system and joined the inventory of bridges owned by government and financed by taxpayers.

Although the Bridge was perhaps well-suited to the vehicular and non-vehicular traffic of its early days, the Bridge's design is not ideal for modern traffic. The challenges are most pronounced for bicyclists, who must negotiate a cramped causeway carrying some 19,000 vehicles daily, and for pedestrians who come to the bridge from the east side of the roadway and need to cross the busy highway to access the solitary pedestrian causeway on the west side. The Bridge is also a "fracture-critical" structure, meaning it was designed with steel structural members in tension, without structural redundancy, such that the failure of a structural member likely would cause collapse. Because the Bridge is fracture critical, and because it and its substructure of abutments and piers are 90 years old, more detailed biennial inspections are required. This is a function, in part, of the wear and tear of 90 years of traffic. It is also a function of 90 years of exposure to the elements, which have caused major accelerating corrosion in the structural steel beneath the roadway and the distinctive truss superstructure,[2] as well as issues with abutments and piers built with

---

[1] Readers interested in the interurban rail period in Maine may learn more by reading Osmond Richard Cummings' *A History of the Finest Electric Interurban Railway to run in the State of Maine: the Portland-Lewiston Interurban*, published in 1956 by the Connecticut Valley Chapter of the National Railway Historical Society in volume 10 of their Transportation publication, now preserved and made available to the public by the Bangor Public Library through a digital commons special collection, at https://digicom.bpl.lib.me.us/cgi/viewcontent.cgi?article=1042&context=books_pubs.

[2] In response to the 2007 bridge collapse in Minneapolis, Minnesota, the National Transportation Safety Board issued a series of recommendations to the FHWA and the American Association of State Highway

1930s materials and techniques. Given the current condition of the FJW Bridge, DOT has imposed a 25-ton weight restriction, down from 50 tons. AR 399, # 13113. AR 1637, # 37048; AR 1639, ## 37160, 37231-55.

In August 2007, Governor John Baldacci issued an executive order directing the DOT to review existing Maine bridge inspections and programming. Following the review process, DOT issued a report titled Keeping Our Bridges Safe ("KOBS Report"), published in 2007. The KOBS Report identified forty-four fracture-critical bridges in Maine, Frank J. Wood Bridge being but one. Since 2007, eleven of these bridges have been replaced. AR 34.

In 2014, the DOT Commissioner directed DOT's Chief Engineer to reconvene a team of bridge experts to assess DOT's progress towards the goals outlined in the KOBS Report. The team, comprised of public and private engineers, consultants, bridge contractors, and University of Maine engineering faculty, produced an updated KOBS Report in 2014. AR 1637, ## 37071-72; AR 1645.

In 2015, DOT instituted a Bridge Improvement Project for the FJW Bridge. The Project assessed the feasibility of a range of alternatives to address the Bridge's condition, from rehabilitation to full replacement. Meanwhile, in April and May 2017, DOT completed temporary repairs to address the Bridge's most critical need for addition of steel in parts of the floor system and the repair or replacement of missing and deteriorated rivets.

---

and Transportation Officials, which included the recommendation that transportation departments take care to "assess the truss bridges in their inventories to identify locations where visual inspections may not detect gusset plate corrosion." AR 1637, # 37071.

4

AR 1214, ## 29124-65; AR 1637, # 37048.  The Bridge Improvement Project contemplates improvements to address poor structural conditions and load capacity issues on the Bridge and mobility and safety concerns for pedestrians and bicycles. Because of the age of the Bridge, and the large number of heavy loading cycles it has already experienced, "steel fatigue concerns on critical tension members need to be addressed to continue to carry heavy truck traffic on the existing truss." AR 1637, # 37049.

From 2015 to 2018, FHWA and DOT (collectively "the Agencies") consulted with various individuals and groups in a so-called "section 106 process," a reference to the review process associated with the Department of Transportation Act's concern for federal project approval and oversight for projects receiving federal funding, 23 U.S.C. § 106, and conditions placed on access to federal funding under the National Historic Preservation Act, 54 U.S.C. § 306108. The consulting parties included Plaintiff Friends of the Frank J. Wood Bridge, one of its attorneys, Plaintiff Historic Bridge Foundation, and officials, businesses, and residents from Brunswick and Topsham. AR 1643, # 37621-23. The Agencies held section 106 consulting party meetings on July 11, 2016, August 18, 2016, and October 27, 2016, to discuss and receive comments about the section 106 area of potential effects and historical properties, and to evaluate the effects on historical properties for each proposed project alternative.

Alternatives 1 and 2 both propose construction of a new bridge, the difference being that the Alternative 1 bridge would be constructed where the FJW Bridge now stands, whereas the Alternative 2 bridge would be constructed on a curved alignment just upstream of the FJW Bridge. Both replacement alternatives include five-foot bicycle lanes and wider

pedestrian walkways on both sides of the bridge. Between these two alternatives, the Agencies prefer Alternative 2 because it permits the public to continue using the FJW Bridge during construction of the new bridge, a substantial cost savings.

Alternatives 3 and 4 involve different approaches to rehabilitating the FJW Bridge. Alternative 3 proposed to rehabilitate the Bridge but leave the one-sided pedestrian walkway design as is. Alternative 4 is akin to Alternative 3, except a second pedestrian walkway would be added to the east side of the Bridge. All rehabilitation alternatives would improve the width of the shoulders or bicycles lanes by making them four feet wide. Of the rehabilitation alternatives, Plaintiffs prefer Alternative 3 because the addition of another walkway is at odds with their historical preservation objective.

In February 2017, the Agencies distributed a draft section 106 determination of effect on historic properties for each project alternative, providing copies to the consulting parties and the State Historic Preservation Office ("HPO"),[3] and making the draft available for public review and comment. The Agencies then accepted, reviewed and considered comments on the draft.   In March 2017, the HPO concurred with the determination of the effect on historic properties for each project alternative. The Agencies held a public meeting on April 5, 2017 and continued to accept public comment through April 19, 2017. After further discussion, in November 2018, FHWA, DOT, the HPO, the Advisory Council

---

[3] In Maine, the state historic planning office is the Maine Historic Planning Commission.

6

on Historic Preservation, and some of the consulting parties entered into a memorandum of agreement concerning historical properties. AR 1637, # 37063; AR 1643, # 37606-31.[4]

The Agencies considered the project alternatives in terms of each alternative's ability to address the purpose and needs of the Project, a schema of which is present in the record in the so-called Matrix of Alternatives Investigated. AR 1638, ## 37150-55. The Agencies revised and expanded the Matrix based on input from the public and the Section 106 Consulting Parties (including Plaintiffs). AR 1637, # 37050.

Early in the process (2016-17), the Agencies hired a consulting engineering and design firm, T.Y. Lin International, to prepare a Preliminary Design Report ("PDR") to document general project information, conceptual designs, and corresponding cost estimates. *Id.*, ## 37074-75. T.Y. Lin's PDR also incorporated preliminary plans and other information gathered during the preliminary data gathering stage. The Agencies circulated drafts in June and September 2016. AR 291 (cost estimates as of 05/31/16); AR 374 (estimates as of 06/16/16); AR 486 (estimates as of 09/22/16). T.Y. Lin issued its final PDR in September 2017. "Final PDR," Appendix 2 to the Environmental Assessment and Final Evaluation, AR 1639, ## 37514-34. *See also* AR 980.

---

[4] In addition to considering impacts imposed on historical properties, the Agencies were required to consider environmental impacts associated with the project alternatives. In this regard, they consulted with federal and state natural resource agencies, including the National Marine Fisheries Service, the U.S Army Corps of Engineers, and the Maine Department of Marine Resources. In a Biological Opinion dated March 30, 2018, the Fisheries Service concluded that Alternative 2 (FHWA's and Maine DOT's preferred alternative) is likely to adversely affect, but not likely to adversely modify or destroy, critical Atlantic sturgeon habitat, and may affect, but is not likely to adversely affect, Atlantic sturgeon, endangered shortnose sturgeon, endangered Atlantic salmon, or critical habitat designated for Atlantic salmon. AR 1637, ## 37054-55. Although Plaintiffs case is based in part on the National Environmental Policy Act, they are not challenging the environmental assessment component of the administrative decision based on any alleged shortcoming in the discussion of impacts to marine species.

Appendix H of the Final PDR contains itemized cost estimates for each alternative and culminates in two alternative methods for estimating the total cost of each alternative: a "service life" method and a "life cycle cost analysis" method. AR 1637, ## 37071-78, 37108-111; AR 1639, # 37185; AR 1644, ## 37919-21, 37928-41. The life cycle cost analysis ("LCCA") is an economic analysis tool often used to compare the cost-effectiveness of competing transportation project alternatives. AR 1637, # 37109. LCCA totals all estimated bridge costs throughout the expected life of each alternative, but then translates the sum of the life-cycle costs to current dollar equivalents by using an annual discount rate to arrive at a "present value". *Id.*; AR 1639, # 37185; AR 1644, # 37921. The efficacy of the LCCA method is based, in part, on an assumption that state transportation agencies will be able to recognize the need to plan for the payment of future work. AR 1637, # 37109. Another useful attribute of the LCCA is that it can be used to demonstrate how more expensive design alternatives with longer life cycles can save money in the long run when compared with less expensive fixes with shorter life cycles.

Used as intended, the LCCA may serve as a tool to ensure pragmatic investment in the best long-term alternative. Here, however, Plaintiffs advocate adherence to the LCCA because the LCCA makes the rehabilitation option appear less profligate from a financial standpoint. The Agencies, on the other hand, agreed that the LCCA should be reported and considered, but reasoned that it should not be determinative of outcome because DOT, like many state transportation departments, is experiencing a funding crisis and it is not prudent to assume the LCCA serves the public interest when it is used the way Plaintiffs insist it

8

must be used. *Id.*; AR 1639, # 37185; AR 1644, # 37921. Instead, the Agencies looked at service life costs as the more meaningful comparator.

According to the Agencies, service life costs provide the more accurate comparison of the real costs when considering bridge improvement alternatives. Service life cost represents the total cost to maintain a structure over its anticipated service life. Service life, in turn, is defined as the number of years a bridge can be part of the transportation system with maintenance and repair or rehabilitation before its eventual replacement. The service life cost includes the cost of initial construction and the cost of future inspection, maintenance, and rehabilitation. Costs are broken down into required annual costs (e.g., inspections and anticipated maintenance) as well as periodic items (e.g., bridge painting, deck replacements, and structural rehabilitation). These costs are estimated based on the historical maintenance needs of similar bridge types and historical data on costs. Unlike LCCA, a service life cost estimate is not discounted to current dollar equivalents. AR 1637, # 37109; AR 1639, # 37185; AR 1644, # 37921.

The use of a service life cost estimate is not inconsistent with the Maine Bridge Design Guide, which explains that:

> The Designer should not rely solely on LCCA. The results from LCCA always show deferring costs as the most cost-effective solution. However, it is important to consider the additional costs to maintain an old bridge, the impact to the traveling public as a result of additional maintenance work, risks associated with a deteriorating structure, and availability of funding when replacement becomes absolutely necessary. The functionality of the bridge is also important. Replacing a bridge to modern standards may provide an increased bridge width, new sidewalks, or an improved alignment.

AR 22, # 1709.

For the Project under review, the Agencies considered and calculated construction and maintenance costs for each project alternative using both the LCCA and the service life methods, supplying inputs based primarily on recent bid histories for similar projects. AR 1637, # 37074-75.

Among all the alternatives ever proposed was one involving a rehabilitation approach having a 30 or 35-year service life. AR 1018, #25870. However, during public meetings in June and July 2016, Plaintiffs pressed for a rehabilitation with a 75-year service life. AR 298, #11851; AR 352, #12540; AR 1018, #25870; AR 1644, #37922. Because of this input, the Agencies focused on the 75-year rehabilitation alternatives following a meeting on July 11, 2016. AR 1644, #37922.

In February 2018, the Agencies produced the first draft of their Environmental Assessment and Section 4(f) Evaluation. AR 1167; AR 1637, #37048-49. As part of that initial drafting process, they considered documents and opinions submitted by Robert Shulock and JDB Consulting Engineers, Inc. ("JDB Consulting"), plaintiffs' experts. AR 1238, ## 30194-96; AR 1637, ## 37053-54, 37093-95, 37098-111, 37127-34; AR 1649, # 38425. The Agencies circulated the draft to the Section 106 Consulting Parties and posted it on the DOT website for public comment. AR 1637, #37084.

On February 28, 2019, after reviewing comments to the draft, the Agencies issued an Environmental Assessment ("EA") and a Final Section 4(f) Evaluation ("Final Evaluation"). AR 1637. In the EA, the Agencies addressed, inter alia, the environmental impacts on natural resources, cultural resources, and social and economic resources in

10

accordance with the requirements of the National Environmental Policy Act.[5] *Id.*, ##
37043-37112. In the Final Evaluation, which document the Agencies folded into the
combined document as Section N, the Agencies stated their conclusion that there is no
feasible and prudent alternative to the "use" of the Frank J. Wood Bridge and associated
historical properties and that the anticipated use includes all possible planning to minimize
harm to the associated historical properties. AR 1637, # 37117.

In support of their finding that the rehabilitation alternatives are not prudent, the
Agencies explained that these alternatives involve "Service Life Costs of extraordinary
magnitude," citing 23 C.F.R. § 774.17(iv). *Id.*, # 37142. They also faulted the suitability of
the rehabilitation alternatives in terms of addressing the Frank J. Wood Bridge's load-
capacity and fracture-critical concerns. *Id.*, ## 37119-37120 & n.2.[6] By the Agencies'
calculations, the rehabilitation alternative preferred by Plaintiffs (Alternative 3) would cost
an estimated $35.2 million over 75 years. AR 1639, # 37179. The Agencies also anticipated
that painting requirements over the lifetime of the Bridge would require extended traffic

---

[5] In March 2019, the Agencies issued a separate NEPA document in which they stated their finding that the
preferred replacement alternative will have no significant impact to the human environment and that a more
elaborate environmental impact statement is not required. U.S. Dep't of Transp. and Federal Highway
Admin., Finding of No Significant Impact, Frank J. Wood Bridge Project (Mar. 12, 2019), AR 1655,
# 38861.

[6] The Agencies also discussed the desire to find a solution for pedestrian and bicyclist mobility issues.
However, it is possible to improve conditions for pedestrians and cyclists with a rehabilitation project that
fully decks the area between the truss uprights and adds a sidewalk on the east side of the bridge, though
the resulting travel lane for cyclists would still be sub-optimal. Appendix 2, AR 1639, # 37171. In any
event, the Agencies have not cited pedestrian and bicyclist mobility as a significant enough issue on its own
to render a rehabilitation alternative imprudent or infeasible.

interruptions. Also, they noted that the Bridge would retain a fracture-critical design. AR 1638, ##37150-55.

In comparison, the Agencies concluded that Alternative 2 would have lower cost (half as much with a longer service life), lower risk in terms of unanticipated costs, and easier long-term inspection and maintenance processes without any major ongoing maintenance burdens. AR 1638, ## 37150-55. According to the Agencies, a new steel girder bridge is not only less expensive than alternative bridge types for the range of spans needed for this Androscoggin River crossing, but also more capable of enduring the elements because of metalized girders, corrosion-resistant reinforcing bar, and high-performance membrane waterproofing. AR 1639, ## 37170-71. "The primary anticipated maintenance would be to mill and resurface the asphalt wearing surface at regular intervals and to paint the girders." AR 1639, # 37171.

Table 5 in the Final Section 4(f) Evaluation details the estimated service life costs of Alternatives 1, 2, 3, and 4. AR 1637, ##37076, 37141. Several disputed cost items contribute to the high cost of Plaintiffs' preferred Alternative 3 and, according to Plaintiffs, mask the real cost of the Agencies' preferred Alternative 2. These disputed cost items will be considered further in the discussion.

## DISCUSSION

The final administrative decisions set forth the Agencies' findings concerning the National Environmental Policy Act ("NEPA"), Section 4(f) of the Department of Transportation Act, and the National Historic Preservation Act. In this case, Plaintiffs press claims for judicial review of the NEPA and Section 4(f) findings. Each statute supplies a

set of standards to be used by the agency when it evaluates impacts on the interests the statute is designed to protect, and my review of the agency's handling of these standards is deferential in keeping with the Administrative Procedures Act ("APA").

When conducting APA review, I will uphold administrative findings of fact provided they are supported by "substantial evidence," meaning the kind of evidence a reasonable mind would accept as adequate to support a conclusion. *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. Federal Aviation Admin.*, 651 F.3d 202, 207 (1st Cir. 2011). I will not set aside an administrative judgment unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). "Agency action fails under this standard 'if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Id.* (*quoting Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). Furthermore, under ordinary circumstances an agency is "entitled to use any reasonable methodology to arrive at a decision." *Town of Marshfield v. F.A.A.*, 552 F.3d 1, 4 (1st Cir. 2008).

## A.   NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq.*, requires federal agencies to take a hard look at environmental concerns before funding development projects or authorizing or permitting components of development projects. *Kleppe v. Sierra*

*Club*, 427 U.S. 390, 410 n.21 (1976). Here, because the Bridge Improvement Project relies on federal funding, it is undisputed that it is subject to the NEPA review process.

NEPA itemizes several expectations about what the environmental review process should look like and the kind of data that should be considered. 42 U.S.C. § 4332(2). Most germane to this litigation is the statutory expectation that the reviewing agency will prepare a detailed environmental impact statement ("EIS") whenever the project in question is a "major Federal action[] significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). If it is not obvious that the project will significantly affect the quality of the human environment, the agency will, typically, conduct an environmental assessment ("EA") and produce a document that memorializes its assessment of, inter alia, the significance question. If the agency's assessment concludes with a finding of no significant impact ("FONSI"), then the agency will authorize the project without conducting the more elaborate EIS. *E.g.*, *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985) ("The purpose of an EA is simply to help the agencies decide if an EIS is needed.").

These requirements are "designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). NEPA "'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action' and to 'ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process.'" *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 300 (1st Cir. 1999) (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*,

14

*Inc*., 462 U.S. 87, 97 (1983)). However, these requirements "are procedural in nature and are not intended to dictate any particular substantive outcome." *Safeguarding the Historic Hanscom Area's Irreplaceable Res*., *Inc. v. F.A.A.*, 651 F.3d 202, 217 (1st Cir. 2011) (emphasis added). In effect, NEPA is agnostic concerning the detrimental impact of federal action but requires that an agency produce an EIS when the circumstances call for one.

My NEPA discussion begins with the baseline assumption that an EA was adequate for NEPA purposes. I, therefore, address first whether the EA is critically deficient in some respect that would warrant a remand before reaching the dispute about the alleged need for an EIS.  In my view, based on Plaintiffs' arguments, this entails the following sequence of analysis: (1) whether the EA adequately addresses alternatives for purposes of § 4332(2)(E); (2) whether an EIS is required based on controversy in the record; and (3) whether an EIS is required given that it is understood by all that the project will result in adverse impacts to historical preservation interests.

### 1.    Does the Final EA adequately address project alternatives for purposes of 42 U.S.C. § 4332(2)(E)?

NEPA § 4332(2)(E) sets the expectation that an agency will "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Plaintiffs argue the FHWA failed in this regard because it did not consider "the less costly alternative of rehabilitating the historic Bridge for 35-year service life, which would have fully satisfied the purpose and need for the project … and would have also been the least costly alternative." Plaintiffs' Mem. at 30 (ECF No. 35-1).

Plaintiffs' argument is not persuasive from a NEPA perspective.[7] The EA quite clearly reflects that the review process was focused on studying, developing, and describing competing alternatives. Moreover, the expansive administrative record reveals that the review process included consideration of a 35-year life extension for the Frank J. Wood Bridge. Although T.Y. Lin at one point in the process described the alternative as "cost effective" (AR 173, Bates 9691), NEPA does not compel an agency to select restoration over replacement. Moreover, the FHWA's acknowledgement of the alternative in its draft EA and subsequent explanation for rejection of the alternative in its final EA served the public notice and related process interests NEPA is designed to serve. From the NEPA standpoint, Plaintiffs fail to demonstrate that the FHWA's handling of the 35-year alternative was arbitrary or capricious, and abuse of discretion, or otherwise violative of NEPA.

### 2.    Is an EIS required based on controversy in the Record?

The lead NEPA regulatory body is the Council on Environmental Quality ("CEQ"). Its regulations state that an agency should consider the "context and intensity" of proposed action when deciding whether to produce an EIS. 40 C.F.R. § 1508.27 (2018). In relation to intensity, the CEQ advises agencies to consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." *Id.*  C.F.R. § 1508.27(b)(4). In addition, the CEQ regulations state that an agency must make available to the public "environmental information" that is "of high quality," recognizing that

---

[7] Plaintiffs' argument also raises a concern under the Department of Transportation Act, which will be addressed separately.

16

"[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (2018).

Plaintiffs argue that the EA was inadequate and that an EIS is compelled by the fact that they have raised a controversy about the accuracy of the cost of different bridge alternatives. Plaintiffs' Mem. at 34.  Of course, if Plaintiffs can prove that the cost estimates do not support the ultimate determination that rehabilitation involves extraordinary cost, then they will have advanced their APA challenge to relevant administrative fact finding, including for the purposes of NEPA.  However, from the NEPA procedural perspective, the cost controversy does not tend to demonstrate the inadequacy of an EA. A NEPA "controversy" is one related to the intensity of an environmental impact. Controversy about cost estimates is a different concern. The relative intensity of the environmental impact of bridge replacement is the same regardless of the accuracy of cost estimates. Thus, although I recognize that the estimates are important to my review and that a lack of substantial evidentiary support for the administrative decision would call for vacatur and remand of both the NEPA EA and the Section 4(f) Final Evaluation, it would not necessarily follow that the Agencies could not rectify any shortcoming in the record through supplemental EA proceedings rather than by preparing an EIS. In any event, for reasons that will be related in the Section 4(f) discussion, substantial evidence supports the Agencies' final administrative decision.

3.      **Does the EA permissibly end with a FONSI where it is understood that the project will impose adverse impacts on historical properties, including replacement of the Frank J. Wood Bridge?**

NEPA calls for production of an EIS when a project "will or may" result in significant environmental impacts. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.3 (1978) (defining "affecting" as "will or may have an effect on") (superseded effective Sept. 14, 2020). Additionally, one of the important interests Congress sought to protect with NEPA is the interest in "preserv[ing] important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b)(4). This begs the question whether a project that proposes the demolition of a historic bridge in a historic district will necessarily "significantly affect the quality of the human environment" and compel the reviewing agency to produce an EIS for the project. 42 U.S.C. § 4332(2)(C). Intuitively, it would seem so, but the cases and administrative regulations do not dictate this conclusion. Instead, because the statutory framework for administrative decision-making about historic properties, the National Historic Preservation Act ("NHPA"), prescribes procedures specifically designed to protect historic preservation interests, courts have not compelled agencies to produce an EIS instead of an EA based merely on the significance of impacts to historical properties, but have instead considered whether the agencies complied with the prescribed historic preservation procedures. *See*, *e.g.*, *Irreplaceable Res.*, *supra* (upholding NEPA EA/FONSI where agency otherwise satisfied review standards specific to the Department of Transportation Act and the NHPA); *Coliseum Square Ass'n*, *Inc. v. Jackson*, 465 F.3d 215, 242 (5th Cir. 2006) (upholding NEPA EA/FONSI despite findings of adverse impacts to historical properties where agency complied with procedural

requirements of the NHPA (citing, *inter alia*, 36 C.F.R. § 800.8)). This makes sense given that NEPA is a procedural statute and mandatory production of an EIS would not advance the NEPA procedural interest in historic preservation beyond what the other statutes already dictate in the way of procedure.

Given the foregoing consideration and given Plaintiffs' failure to raise any claim of a shortcoming in the NHPA process, Plaintiffs' argument about the supposed need for the Agencies to produce an EIS pursuant to NEPA rings hollow in terms of the historic preservation interest.

In summary, vacatur and remand of the EA is not warranted based on NEPA-specific judicial review related to the adequacy of the administrative process from a procedural perspective. Such relief would be warranted only if Plaintiffs demonstrate that the Section 4(f) determination concerning prudential use of historic properties is not supported by substantial evidence, relies on an irrelevant factor, or is the product of a defective application of reason.  I turn to that concern now.

**B.   SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT**

The Department of Transportation Act ("DOT Act") "authorizes federal agencies dealing with transportation matters to approve projects that entail the use of historically significant sites." *Safeguarding the Historic Hanscom Area's Irreplaceable Res.*, *Inc. v. F.A.A.*, 651 F.3d 202, 207 (1st Cir. 2011) (citing 49 U.S.C. § 303(c)). However, unlike NEPA, the DOT Act conditions such use by imposing a "substantive mandate," *Neighborhood Ass'n Of The Back Bay*, *Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006), which mandate is relatively "stringent," *Save Our Heritage*, *Inc. v. F.A.A.*, 269

F.3d 49, 58 (1st Cir. 2001). In other words, the DOT Act imposes standards that can be utilized to direct outcomes. Specifically, approval of the use of a historically significant site is permissible if (1) "there is no prudent and feasible alternative to using that land" and (2) "the program or project includes all possible planning to minimize harm." 49 U.S.C. § 303(c). "These preconditions apply both when a proposal involves the physical use or occupation of a protected property thought to be historic and when a proposal involves indirect (but meaningful) effects on historic venues." *Safeguarding*, 651 F.3d at 207-08 (citing *Save Our Heritage*, *Inc. v. FAA*, 269 F.3d 49, 58 (1st Cir. 2001)).

My APA review of the DOT Act Final Evaluation begins with a few givens. First, it is undisputed that the proposed use of the Frank J. Wood Bridge is subject to review under the DOT Act. Both the Bridge's characteristics and its placement in a site with other historical properties call for this conclusion.[8] Additionally, it is undisputed that every alternative considered by the Agencies is feasible from an engineering standpoint. Lastly, nobody contends in this litigation that the appropriate action is "no action"; the dilapidated condition of the Frank J. Wood Bridge is acknowledged by all. Instead, the issue is whether the Agencies reasonably concluded that the rehabilitation alternatives are not prudent due to extraordinary cost.

---

[8] The Frank J. Wood Bridge is a contributing resource in the Brunswick and Topsham Industrial Historic District, alongside the Cabot Mill and the Pejepscot Paper Company, which together "represent a localized, intact industrial area that utilized copious water power to produce goods and provide employment" between 1850 and 1967. Final Eval. at 5, # 37122. In addition, the Bridge "is individually eligible for the National Register" given that it was constructed for the interurban rail lines connecting Brunswick and Lewiston. *Id.* at 6, # 37123.

By regulatory definition, "[a]n alternative is not prudent if it results in additional construction, maintenance, or operational costs of an extraordinary magnitude." 23 C.F.R. § 774.17(3)(iv). The Agencies rejected the rehabilitation alternatives based on, predominantly, the price tag associated with the long-term carrying costs of maintaining a rehabilitated bridge. In their estimation, the costs are extraordinary and therefore not prudent. Plaintiffs have the burden of demonstrating that the Agencies' determination in this regard is not supported by substantial evidence in the record or depends on faulty reasoning. *Save Our Heritage,* 269 F.3d at 60; *see also* 23 C.F.R. § 774.7(a) ("A Section 4(f) evaluation … shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative ….").

Plaintiffs argue the cost estimates "do not conform" to applicable guidelines "and are contrary to the viewpoints supplied by numerous experts, including [agency] experts," and therefore lack support in the record. Plaintiffs' Motion at 2. In support of their critique of the estimates, Plaintiffs present reports from consultants and argue the Agencies owe "a meaningful response … regarding the inaccuracies in the costs and frequency of specific life cycle costs attributed to the rehabilitation and replacement alternatives." *Id.* at 10.

The disputes include the finding that extensive improvements are needed to overcome the load restriction on the existing bridge, the finding that a rehabilitation project would reasonably call for the erection of a temporary bridge to avoid subjecting the traveling public to the inconvenience of detours and traffic congestion for a protracted build

cycle,[9] the expense of painting an elaborate metal truss system that is covered with rust, increased contingencies associated with the rehabilitation of an aged bridge, and increased biennial inspection burdens. Similarly, there are other disputed cost items that Plaintiffs believe should have increased the estimated cost of the replacement bridge alternative. The discussion of these disputes is divided into two sections. The first discussion section collects disputes related to the cost for completion of the construction projects. The second collects disputes related to the cost for long-term maintenance throughout each alternative's reasonable life cycle.

### 1.    Disputes about the PDR Structural Cost Estimates

Plaintiffs' challenges to the PDR Structural Cost Estimates concern the need for a temporary bridge if the existing bridge is rehabilitated, the cost of a replacement bridge given the need to construct a work trestle, and certain discrepancies related to cost items. Plaintiffs also contend the Agencies failed to consider a less ambitious rehabilitation alternative having a 30 to 35-year life cycle. *Id.* at 3.  I consider the 30 to 35-year alternative first.

#### a.    *The 30-to-35-year alternative*

Plaintiffs' argument about the 30 to 35-year alternative misstates the record. In fact, the Agencies did consider the alternative and, initially, characterized it as cost-effective because it was anticipated that the deck repair could be less extensive this way, entailing a shorter construction period handled with lane closures and detours, and because the

---

[9] The preferred alternative involves construction of a new bridge and a building process that can transpire, for the most part, while the public continues to use the existing bridge.

alternative eliminated the need for future painting (assuming the bridge would be replaced at that time).  However, the Agencies revisited the underlying assumptions about the extent and duration of needed deck work after an inspection (concluding that the necessary repairs would be more extensive and that total bridge closure would be indicated) and took into consideration the cost exported onto the community in the form of more lengthy detours and delays. Based on these factors they reasoned that construction of a temporary bridge reasonably would be indicated, and that it was not prudent to incur this cost or the cost of a more extensive deck overhaul to kick the can down the road a mere 35 years. EA at 7, #37051 n.5. In their words:

> Early in the investigation of alternatives at this site prior to the August 2016 inspection, this alternative was examined as a 30 year rehabilitation and either maintaining one lane of traffic on the bridge or allowing a 5 to 7 month bridge closure. The initial estimate for this improvement was $8 million, which was less expensive than the least-cost replacement alternative and potentially a cost-effective improvement solution if its life-cycle cost was competitive. It was anticipated that a deck replacement with minor steel rehabilitation with a full painting now would yield a bridge that would not need significant capital improvements for 30 years. A complete replacement would then be needed. A replacement after 30 years would yield the lowest life cycle cost of any rehabilitation alternative because expensive capital improvements such as repainting and substructure repairs would be avoided. Also, 45 years of costly inspection and maintenance would be avoided. However, the August 2016 inspection recommended a complete floor system replacement with extensive repairs to the bottom chords of the truss. Maintaining one lane of traffic would not be possible. Given changes to the rehabilitation scope and the associated user costs for maintenance of traffic (see Maintenance of Traffic Section), the initial cost of this alternative now includes a temporary bridge and a full floor system replacement. The originally estimated construction cost of $8 million to rehabilitate the bridge now is $15 million after adding a full floor system replacement and an on-site temporary bridge detour.

DOT Preliminary Design Report (Aug. 2017) at 22, AR 980, # 24307.

This is a well-reasoned application of administrative discretion. The reasoning is also supported by substantial evidence in the form of the August 2016 Inspection Report, which undermines the assumptions that went into the affordability of a 35-year delay in decommissioning the Frank J. Wood Bridge. Inspection Report 8/1/16 – 8/2/16, AR 399 (Part B). Given the need for more elaborate repairs and bridge closure, a reasonable mind could accept that the supposed 35-year alternative effectively becomes a 75-year alternative. The balance of this discussion proceeds with that understanding.

### b.   *Overestimating rehabilitation cost*

#### i.   Temporary bridge

Because rehabilitation plans require complete bridge closure for approximately 20 months, the Agencies concluded it would be appropriate to install a temporary bridge estimated to cost $4 million. AR 1637, ##37068-69. According to Plaintiffs, traffic management for the duration of the rehabilitation project should rely entirely on detours rather than a temporary bridge.  They describe a $4 million temporary bridge as an irrational expenditure for what would otherwise be a mere three or four-minute detour. They cite in support of their argument DOT's "dire" funding situation. Plaintiffs' Mem. at 18. They also argue that the public can be expected to shoulder whatever burden arises from a detour because that burden is not likely to reach an "extraordinary magnitude." *Id.* at 19 (quoting 23 C.F.R. § 774.17(3) (2018)). Citing their own expert, they advocate constructing a detour with a cost of $1 million instead of a temporary bridge with a cost of $4 million. *Id.*; Apr. 5, 2018 Shulock PE Letter, AR 1238.

Defendants see it otherwise.  They think the Route 201 Corridor has sufficient traffic (on average 19,000 daily vehicles) to  warrant a temporary bridge given the length of the detour (2.5 miles for through traffic or 3.7 miles end-to-end), the length of the rehabilitation project (20 months), and the special burden a detour would place on area businesses and locals. They also quantify the burden placed on the traveling public based on rates of $12.89 per hour and $0.37 per mile, translatable to roughly $1.16 per vehicle per day, which over the span of 20 months adds up to over $13,000,000. AR 980, # 24619; AR 1644, ##37918-19.

Defendants approach to this piece of the puzzle is sustainable. A reasonable mind could accept that bridge closure is prudent for the rehabilitation alternatives and that the public cost associated with Plaintiffs' proposed detour should be factored into the choice between a detour or a temporary bridge. Defendants, instead of basing their decision on the $13,000,000 in costs placed on the traveling public, identified a $4,000,000 work around.[10] Plaintiffs have not persuaded me that this is an irrational approach to the problem. Nor have they persuaded me that Section 4(f) requires the local traveling public to foot the bill to avoid use of historical properties so long as no member of the public suffers to an extraordinary degree. Section 4(f) allows for the use of historical properties based on

---

[10] Based on the calculations, even if one assumes a lane of travel could be maintained on the Bridge during a rehabilitation project, the cost imposed on the traveling public would still exceed the cost of a temporary bridge. AR 980, #24619. Plaintiffs argue that Defendants never before considered that a complete closure of the bridge would "result in unacceptable temporary traffic impacts." Plaintiffs' Mem. at 19. However, the document they cite in support of this contention (AR 130) does not undermine the Agencies' final assessment on the issue.

prudential considerations. Inclusion of a temporary bridge in the cost of the rehabilitation alternatives is a prudent approach to the problem.

ii.    Contingency rate

The next piece of the puzzle is Plaintiffs' argument that the Agencies goosed the cost of the rehabilitation alternatives unfairly by applying a 15% contingency rate not applied to the new bridge alternatives.  Plaintiffs' Mem. at 22-24. They maintain that the rationale for use of the 15% contingency on the rehabilitation alternatives (fluctuations in the price of steel) should apply equally to the replacement alternatives. *Id.*[11]

Defendants state the contingency rates are based on past project histories for similar types of bridge projects, that every alternative carries a 7% contingency cost, and that the two rehabilitation alternatives also include a 15% rehabilitation contingency cost. This 15% contingency is based on DOT's experience that it is difficult to know the precise condition of bridge elements until work is underway and, as components of the bridge are exposed, it is common to discover additional section loss and more deterioration than anticipated. Defendants say rehabilitation projects nearly always discover issues not previously found in inspections, leading to budget overruns. In the truss system alone, the need to remove deterioration, rust, and old paint will often uncover additional steel areas that need strengthening, repair, or replacement, such as deteriorated rivets and gusset plates. AR 1637, ## 37074-75, 37138-39; AR 1644, # 37920.

---

[11] Plaintiffs also cite FHWA guidance that recommends a 5-15% contingency rate for construction overruns on certain projects. Plaintiffs' Motion at 23. However, the guidance applies to "major projects" costing at least $500 million, which this project is not.

While the justification for the 15% contingency on rehabilitation alternatives is, in part, based on the price of steel, it is more specifically based on "recent low bids for steel repairs on steel girder and steel arch style bridges [that] range from $11/lb. to $24.50/lb., making the 15% for rehabilitation contingencies a conservative estimate." AR 1637, ## 37138-39. In other words, the logic is not equally applicable to new construction. The increased contingency is otherwise based on administrative experience, which teaches that "[r]ehabilitation projects nearly always discover issues not previously found in inspections, causing budget overruns." *Id.*, # 37139. I do not see any illogic in this explanation or an abuse of discretion in the application of expert administrative judgment.

### iii.   Erecting steel

The last piece of the rehabilitation cost puzzle is Plaintiffs' challenge to the Agencies' significantly higher estimate of the cost to erect structural steel for purposes of rehabilitation. According to the PDR, a new bridge would require the erection of 1,753,000 pounds of structural steel at a cost of $0.36 per pound, totaling $631,080. AR 980, #4652. However, when it comes to rehabilitation, although the PDR says it would require only 444,000 pounds of steel, it states the cost as $1.80 per pound, totaling $799,200. *Id.* # 4657. Plaintiffs say the record lacks an explanation for the significantly greater rate applied to the rehabilitation alternatives.

Defendants offer little in response. FHWA simply states that DOT "based its estimates on bid history data" and "engineering judgment." FHWA Mem. at 18, citing AR 182 # 10075 and AR 1637, ## 37074-75. But DOT recasts the issue as whether its structural-steel-erection cost estimate was reasonable for the replacement bridge, without

27

ever addressing why the per pound rate for the rehabilitation estimates is so much higher.
DOT Mem. at 30. This one item alone (i.e., use of the same per pound rate of $0.36 for
rehabilitation) would decrease the estimated cost of rehabilitation by more than $600,000.
Given Defendants' obtuse response to this concern, it appears there is a factual finding in
the administrative decision that lacks support in the existing record. However, whether this
flaw warrants a remand is less apparent. I consider that question further in my discussion
of the methodology the Agencies employed to project the service life costs of the
alternatives, which, after all, is the primary reason the Agencies supplied for selecting a
new bridge alternative.

### c.   *Underestimating replacement cost*

Plaintiffs say the cost estimate for bridge replacement is too low and ignores
evidence in the record, citing the consultant report of On Point Construction Services.
Plaintiffs' Mem. at 20 (citing AR 157, ## 8989-90). Specifically, Plaintiffs identify
discrepancies related to the cost of removing the existing bridge and a more sizeable
discrepancy related to the cost associated with installation and modification of a work
trestle needed to erect the new bridge and demolish the old. *Id.* at 20-21 & n.9.
Additionally, Plaintiffs observe that DOT's budget for 2020-21 allocates an additional $4.8
million to the replacement project over and above the PDR estimate. *Id.* [12]

---

[12] Plaintiffs also note that there are environmental mitigation requirements associated with the replacement
project that are not accounted for in the PDR. Plaintiffs' Mem. at 24. Specifically, the placement of the
chosen replacement alternative raises a concern related to vibrations because the new bridge would be closer
to the Brookfield Dam fishway. EA at 16-17, AR 1637, ## 37060-61. Plaintiffs have not demonstrated that
this environmental consideration demands a different cost estimate for Alternative 2. The EA also reflects
that design components address and likely mitigate this impact. *Id.*

i.      Removal of the FJW Bridge

The PDR cost estimate for the chosen alternative states that removal of the existing bridge will cost approximately $1 million. On Point Construction Services, a consultant retained by Defendants to provide cost estimates, stated the cost of demolition would be $1.39 million. AR157, #8990. T.Y. Lin, the engineering consulting firm that prepared the PDR, considered On Point's input, which was addressed to T.Y. Lin, but instead used an estimate of $1 million. AR 182, #10054. Plaintiffs have not demonstrated that this choice was arbitrary and given T.Y. Lin's assessment there is substantial evidence to support the administrative decision on this line item.

ii.      Structural steel erection

Plaintiffs argue the PDR uses an unreasonable cost per pound figure for structural steel erection for a new bridge, citing a higher rate suggested by On Point in its "rough" estimate of $830,000. Plaintiffs' Mem. at 20; AR 157, # 8989. However, in addition to its "rough" nature, the On Point estimate is of limited probative value given that the Agencies did not ask On Point to provide a cost estimate for structural steel erection. They instead relied on a lower unit cost estimate based on "bid history data for recent similar bridge projects in Maine." DOT Mem. at 30; AR 182, #10075, line 504.71. Plaintiffs have not demonstrated that this choice was arbitrary.[13]

---

[13] In other words, I conclude the record is adequate to support a finding as to this line item of the new bridge cost. What is missing from the record – at least Defendants have not identified it – is evidence explaining why a much higher per pound rate was used for steel erection for rehabilitation, as I discussed in the previous section. Conceivably this is a function of the trestle superstructure that would complicate placement of steel members, but this is not stated.

### iii.    Work trestle

The most noteworthy challenge concerns the likely cost of a work trestle, a construction requirement for the replacement alternatives that is not needed for the rehabilitation alternatives. The work trestle would be needed both to erect the new bridge and to demolish the existing bridge. For this component of the chosen new bridge alternative, On Point was asked to provide input concerning possible trestle layouts and costs. On Point discussed three possible approaches to trestle design and estimated that the cost would range between $1.825 and $6.5 million. AR 157, ## 8985-87. Both the DOT's inquiry and On Point's report reflect that the construction site presents certain challenges that will increase costs.

The PDR folds the work trestle cost into a line item called "Miscellaneous," but allows only a $1 million "premium" for it. AR 1639, # 37516. Plaintiffs say the trestle is a major cost item because it must carry a load greater than a temporary bridge and because of challenging site conditions. Plaintiffs' Mem. at 21. DOT says the trestle is something the contractor will need to consider in its bid for the project and that a contractor will need to construct a work trestle with materials in the contractor's existing construction inventory. DOT Mem. at 30-31; AR 1644, # 37920 ("Generally, the major bid items would include the cost of work platforms and trestles. However, this site is considered more difficult due to its topography so an additional $1 million was added to account for this."). DOT also observes that it would be unreasonable to price the trestle higher than a temporary bridge, in any event, because a trestle does not need to be surfaced for the traveling public. DOT Mem. at 31 n.18. From these points, DOT extrapolates the

conclusion that its $1 million premium "was not inconsistent with On Point's stand-alone estimate of $6.5 million." *Id.* at 31. FHWA agrees with this assessment. FHWA Mem. at 17-18.

As to the cost of a work trestle, Plaintiffs have for a second time flagged record evidence that tends to demonstrate that the DOT's structural cost estimates for a new bridge are not conservative estimates, which in turn tends to invite some apprehension in a reasonable mind. Although an agency's application of its own expert judgment to technical considerations within its purview is deserving of "great deference," *DiPerri v. Fed. Aviation Admin.*, 671 F.2d 54, 58 (1st Cir. 1982), and although I am in agreement with the Agencies that the record does not compel a finding that a $6.5 million work trestle is a hard cost of the chosen alternative,[14] the impression remains that DOT was careful to discount cost estimates when it comes to its preferred project alternative. However, as will be discussed below, the critical issue the Agencies relied on to reject the rehabilitation alternatives was the inordinate carrying cost of a rehabilitated bridge rather than the up-front cost of rebuilding its structural components and deck. Thus, while I am apprehensive that the gap between construction estimates for replacement Alternative 2 and rehabilitation Alternative 3 would perhaps disappear upon critical examination by a neutral expert, the Agencies Final Evaluation may still be sustainable if the long-term costs associated with rehabilitation are extraordinary.

---

[14] On Point offered three approaches to the problem, the cheapest of which it estimated to cost $1.825 million. I also appreciate the Agencies' point that a construction firm that bids on the project would evaluate this item based on the firm's inventory of trestle building materials and its construction capabilities and experiences. In other words, there is no turn-key trestle costing $6.5 million that a construction firm would have to purchase to complete the project.

### iv.    DOT budgeting

Finally, on the issue of DOT budgeting for 2020-21, for reasons already noted there is cause in the record to question whether the PDR's $15,000,000 cost estimate for construction of Alternative 2 reflects the same conservative approach to cost estimating that was applied to reach the $17,500,00 cost estimate for rehabilitation Alternative 3. Still, budgeting for 2020-21 at best reinforces this cautionary appraisal of the PDR's comparison of structural costs; it does not blow the comparison out of the water as utterly misguided or prove that the choice between replacement and rehabilitation need not take into consideration long term costs. In other words, although I am somewhat skeptical of DOT's PDR Structural Cost Estimate for Replacement Alternative 2, which I suspect is understated (though not greatly understated), that is a far cry from finding the estimates utterly implausible. Furthermore, even if one assumes that the costs are effectively the same for Alternative 2 and Alternative 3 to be constructed, nevertheless the administrative decision would readily survive judicial review if there is a marked difference in carrying costs between the alternatives. I turn to that issue now.[15]

### 2.    Disputes about long-term carrying costs

Plaintiffs argue the service life projections are unrealistic and "skewed" with a bias for Alternative 2. Plaintiffs' Mem. at 25. The areas of dispute involve painting, deck replacement, inspection, and ongoing substructure rehabilitation. *Id.* at 25-30. Finally,

---

[15] Plaintiffs themselves state, not unfairly: "It is perhaps [because of the foregoing construction cost considerations] that the Section 4(f) Evaluation refrained from concluding that the rehabilitation alternatives could be rejected based on higher construction costs, and instead relied on the alleged 'service life' costs of extraordinary magnitudes to justify the rejection of these alternatives." Plaintiffs' Mem. at 24.

Plaintiffs argue the service life cost methodology is unprecedented and unjustified from a budgetary perspective. *Id.* at 30-34.

### a. *Recurring cost to paint the trestle*

The parties agree that a rehabilitated bridge should be painted every 20 years, or three times during its 75-year service life. The Agencies estimate based on bid histories that each painting will cost $4 million in today's dollars due to the more elaborate configuration of the trusses and significant corrosion. Plaintiffs argue the estimate is excessive because DOT in 2016 accepted a $2.7 million low bid for a similar bridge project, because T.Y. Lin estimated $3.26 million for the work early in the project review process, and because, in Plaintiffs' view, the first preparation for painting will significantly reduce the impact of ongoing corrosion 20, 40, and 60 years down the road. Plaintiffs' Mem. at 25-27; Plaintiffs' Opposition Mem. at 6-8 (ECF No. 41).

The PDR states that a replacement bridge would need to be painted at year 35 and year 70, and that each paint-project would cost $1.75 million. In comparison, the PDR states that the Frank J. Wood Bridge would need to be painted at years 20, 40 and 60 and that each paint-project would cost $4 million. Although Plaintiffs attempt to act like this is inexplicable, the obvious answer to Plaintiffs' challenge is the truss. The truss not only presents a more elaborate surface to paint, but also a surface presently covered with corrosion and, therefore, prone to further ongoing and accelerating corrosion. Defendants readily deflect this argument for the reasons set forth in their memoranda (e.g., historical bids for a similar paint project and the fact that a new bridge would be constructed with

corrosion-resistant, metallized steel[16]) and the portions of the record cited therein. DOT Mem. at 35-37. Significantly, this cost item alone puts a $8.5 million delta between replacement and rehabilitation.

### b.  *Deck replacement and substructure rehabilitation*

The PDR states that the replacement bridge will not require deck replacement over its 100-year service life. On the other hand, if rehabilitated, the Frank J. Wood Bridge would require one more deck overhaul around year 40 of its 75-year service life, at a price of $1 million. The PDR also estimates $1 million each for further substructure rehabilitation at years 20 and 50, without anticipating any need for substructure rehabilitation over the service life of a replacement bridge.

Although the rehabilitation alternatives entail a new deck, the concrete deck system for a rehabilitation is not the same as what would be installed in a new bridge. Moreover, a rehabilitated deck would ride on a substructure that is already 90 years old and was not constructed to modern standards with modern materials. Given these distinctions, I fail to see a basis in the record for me to reject the DOT's expert prediction that the rehabilitation alternatives include very significant ongoing rehabilitation efforts, to include another deck, rather than a fix-it-and-done project free of major recurring costs.

---

[16] The FJW Bridge's total tonnage of steel also significantly exceeds that of a replacement bridge due to the truss superstructure.

### c. *Inspections*

Finally, in terms of costs, Plaintiffs assert that the annual inspection and routine maintenance costs are overstated for the rehabilitation alternatives and understated for a new bridge. Plaintiffs' Mem. at 29-30.  Although the PDR makes these items appear relatively insubstantial, they represent a sizeable cost difference of around $5 million when multiplied out over the life of the respective alternatives.[17]

It strikes me as reasonable to expect that a rehabilitated bridge would present a host of concerns and worries that would not exist for a new bridge. Furthermore, I see no reason to reject the Agencies' statement that inspections of a new bridge are one-day or two-day affairs, whereas inspections of a fracture critical truss bridge can take up to two weeks, involve lane closures, and involve more elaborate reporting requirements. Perhaps the net impact of this line item is overstated at $5 million, perhaps not, but it is not so implausible to think that a reasoned application of agency expertise would assign a sizeable delta.

### d. *Alternative long-term cost methodology*

In addition to challenging the long-term cost inputs, Plaintiffs contend the Agencies went off the deep end methodologically by using a "new and unproven" service life cost estimate rather than the tried-and-true life cycle cost analysis ("LCCA"). Plaintiffs' Mem. at 36. Defendants argue that LCCA is a useful tool but not the only tool that should be employed to measure the long term financial and administrative burdens of project alternatives. DOT Mem. at 45-46; FHWA Mem. at 21-23.

---

[17] PDR Appendix H neglects to subtotal these line items.

In fact, FHWA promotes LCCA as a valuable tool for comparing the cost of project alternatives. Materials maintained on its website, including an article entitled Applying LCCA to Bridges, reflect the importance of using methodologies for studying life-cycle costs, but do not emphasize reliance on discount rates to push more expensive alternatives.[18] To the contrary:

> In the face of increasing public scrutiny, transportation agency officials are under great obligation to demonstrate their stewardship of taxpayer investments in transportation infrastructure. Many transportation agencies are investigating economic tools that will help them choose the most cost-effective project alternatives and communicate the value of those choices to the public. The Federal Highway Administration (FHWA) believes that life-cycle cost analysis (LCCA) can help transportation agencies with this process.
>
> …. LCCA helps transportation agencies answer questions like these:
>
> Which design alternative results in the lowest total cost to the agency over the life of the project?
>
> To what level of detail have the alternatives been investigated?
>
> What are the user-cost impacts of alternative preservation strategies?

Improving Transportation Investment Decisions Through Life-Cycle Cost Analysis, available at https://www.fhwa.dot.gov/infrastructure/asstmgmt/lccafact.cfm. (U.S. Dep't of Transp., Federal Highway Admin.).

As the guidance indicates, LCCA is not designed to be a tool to advocate on behalf of more costly projects, but rather to encourage stewardship over state and federal dollars

---

[18] Life-Cycle Cost Analysis, available at https://www.fhwa.dot.gov/infrastructure/asstmgmt/lcca.cfm (U.S. Dep't of Transp., Federal Highway Admin.).

and to educate the public about the real cost of project alternatives. Thus, although it is true that a complete LCCA will include a statement of present dollar values to allow for a more "direct" comparison, *id.*, the important thing to keep in mind is that for projects designed to last as long as 100 years even relatively small deltas in the discounted present value represent substantial deltas in future spending.[19]

Based on my reading of the administrative decision, the Agencies wanted to drive this point home by focusing on "service life costs" without discounting to present value. They did this because they appreciate that available funding is not adequate for the considerable demands for highway spending statewide, all of which should be considered alongside Plaintiffs' demand for inordinate spending on a dilapidated bridge that has already enjoyed a full life. AR 1637, ##37071-74 & 37134-38. They also characterized it in this fashion because, by regulatory definition, an "[avoidance] alternative is not prudent if it results in additional construction, maintenance, or operational costs of an extraordinary magnitude." 23 C.F.R. § 774.17(3)(iv). The extraordinary nature of excessive spending is, no question, brought into stark relief when one takes a moment to meditate on life-cycle costs before applying a discount rate with a 75 or 100-year term.

The Agencies' decision to compare service life costs rather than just the LCCA discounted costs was reasonable and practical. The Final Evaluation is also supported in this regard by outsized and imprudent costs for a 75-year rehabilitation project designed around an already 90-year-old bridge, even though my review, aided by Plaintiffs' vigorous

---

[19] Here, based on the Agencies' calculations, even the discounted deltas are significant, with Alternative 3 ($21 million) being 53% greater than Alternative 2 ($13.7 million). AR 1638, #37155.

advocacy, has highlighted a few cost items a reasonable mind might well view with skepticism. As to these areas, however, they simply do not demonstrate that the Agencies' arrival at a $17.9 million delta in service life costs is wildly irregular or arbitrary, or that a reasonable person would fail to appreciate a very sizeable service-life delta of $10 million or more, an ample foundation for the Agencies' assessment that Plaintiffs' demand for rehabilitation comes with an extraordinary price tag that, for good and prudential reasons, should not be built into transportation planning given the long list of current and future projects that also demand public funding.

### 3. Summary of APA review of Section 4(f) extraordinary cost finding

When judicial review of a Section 4(f) determination raises concern about the reliability of individual cost components factored into a multi-component finding of extraordinary net cost, it is not a foregone conclusion that remand for further administrative proceedings is warranted. The question is whether there exists "substantial doubt," *Kurzon v. U.S. Postal Serv*., 539 F.2d 788, 796 (1st Cir. 1976), that the agency, on remand, would ascribe to the cost concerns flagged by the court such weight that it would reach a different result. *See*, *e.g*., *Nat'l Parks & Conservation Ass'n v. F.A.A.*, 998 F.2d 1523, 1533 (10th Cir. 1993); *Salt River Project Agr. Imp. & Power Dist. v. United States*, 762 F.2d 1053, 1060 (D.C. Cir. 1985); *Prairie Band Pottawatomie Nation v. Fed. Highway Admin*., 751 F. Supp. 2d 1174, 1211 (D. Kan. 2010), *aff'd*, 684 F.3d 1002 (10th Cir. 2012). Whether to remand for another go "rests in the sound discretion of the reviewing court," which discretion should be guided by such criteria as "the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and

38

public interest considerations." *Cent. Maine Power Co. v. F.E.R.C.*, 252 F.3d 34, 48 (1st Cir. 2001).

Here, when I "evaluat[e] the agency's contemporaneous explanation in light of the existing administrative record," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019), I see cause to opine that certain cost differences were amplified to a degree, but not to such a degree that the Section 4(f) Final Evaluation loses persuasive force or is deprived of substantial supporting evidence. In particular, my impression is that there is some exaggeration in a couple of PDR cost estimates, most notably in relation to the work trestle and the cost of long-term inspection of a rehabilitated bridge. However, the skepticism I have identified is, importantly, only that; I do not find the cost estimates clearly erroneous or so implausible that they cannot be deemed to reflect administrative expertise about the actual costs associated with work trestle deployment or the long-term upkeep of aged truss bridges. In other words, even if I were to characterize the exaggeration as "erroneous" findings, I would by no means accept, for example, Plaintiffs' assertion that the record demonstrates anything on the order of a cost-swing large enough to deprive of substantial evidentiary support and reasoned application of agency expertise the Agencies' finding of an extraordinary cost delta between the chosen alternative and Plaintiffs' preferred alternative. The Record still demonstrates a substantial service life cost delta and a substantial difference between the service lives themselves (100 years versus 75 years). Consequently, I am not persuaded that remand for supplemental decision making is appropriate. In short, there is nothing at all irrational about the Agencies' decision to look at the Frank J. Wood Bridge Project the way they did, let alone anything on the order of

caprice that would warrant my rejection of the Agencies' refusal to commit to inordinate future spending necessary to keep the Frank J. Wood Bridge in service.

## CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment (ECF No. 35) is DENIED; Defendant Commissioner Van Note's Motion for Summary Judgment (ECF No. 39) is GRANTED; and the Federal Defendants' Motion for Summary Judgment (ECF No. 40) is GRANTED.

**SO ORDERED.**

**Dated this 3rd day of February, 2021.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE